FILED

2010 Jul-16  AM 10:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### Southern Division

## CASE NO.:CV-08-B-0761-S

_____
                           :

**SECURITIES AND EXCHANGE**  :
**COMMISSION,**                    :
                           :
        **Plaintiff,**         :
                           :
  **v.**                        :
                           :
**LARRY P. LANGFORD,**     :
**WILLIAM B. BLOUNT,**     :
**BLOUNT PARRISH & CO., INC, AND**  :
**ALBERT W. LAPIERRE,**    :
                           :
      **Defendants.**      :
_____:

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AGAINST DEFENDANT LARRY P. LANGFORD

## I.  INTRODUCTION

Plaintiff Securities and Exchange Commission, pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves the Court to enter summary judgment against Defendant Larry P. Langford based on the doctrine of collateral estoppel.

Langford was convicted and adjudicated guilty in a parallel criminal case of the conduct that forms the basis of the Commission's allegations in this case. Because the doctrine of collateral estoppel precludes Langford from contesting or

re-litigating factual and legal issues decided against him in the criminal case, the Commission is entitled to judgment as a matter of law against Langford on Counts I-III of the complaint.   As set forth below and in our Statement of Undisputed Material Facts ("Facts"), the factual and legal bases for both the conviction and the violations alleged in this case are the same.   Therefore, Langford is collaterally estopped from contesting the allegations of the Commission's complaint.   The Court should enter summary judgment against him and permanently enjoin him from violating the federal securities laws.

## II.  STANDARD FOR GRANTING SUMMARY JUDGMENT

The Court should grant summary judgment if the pleadings and other documents show there is "no genuine issue as to any material fact."  Fed. R. Civ. Pro. 56(c), *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The trial judge must enter summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  *See also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'") (citation omitted).

While the Court must view the facts in the light most favorable to the non-moving party, that party must come forward with "specific facts showing there is a

genuine issue for trial." *Matsushita*, 475 U.S. at 587.  *See also Wohl v. City of Hollywood,* 915 F. Supp. 339, 341 (S.D. Fla. 1995) (party opposing summary judgment must submit evidence sufficient to support a finding by the trier of fact in its favor).  Here, because the doctrine of collateral estoppel precludes Langford from contesting the factual allegations of the complaint, there is no genuine issue for trial and the Court should grant summary judgment for the Commission.

### III.  THE DOCTRINE OF COLLATERAL ESTOPPEL

### A.  Elements Of The Doctrine

The doctrine of collateral estoppel prevents a party who received a full and fair opportunity to litigate claims and related issues of fact and law in one action decided against him from re-litigating the same claims and issues of fact and law in a second action.  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332-33 (1979).  Once a court has decided an issue of fact necessary to its judgment, that fact is conclusively determined in a second suit based on a different cause of action, but involving the same party to the first litigation.  *Montana v. United States*, 440 U.S. 147, 153 (1979).

The use of a criminal conviction as conclusive of an issue in subsequent civil litigation is well established.  *Brazzell v. Adams*, 493 F.2d 489, 490 (5th Cir. 1974) (prisoner's plea of guilty to selling heroin in criminal case collaterally estopped

him from arguing in civil lawsuit he was entrapped by police);[1] *SEC v. Bilzerian*, 29 F.3d 689, 693 (D.C. Cir. 1994) (affirming partial summary judgment in civil litigation based on criminal conviction because "collateral estoppel prohibits relitigation of an issue of fact or law . . . decided in earlier litigation") (citing *Parklane Hosiery*); *Refined Sugars, Inc. v. Southern Commodity Corp.*, 709 F. Supp. 1117, 1120 (S.D. Fla. 1988) (granting summary judgment for plaintiff because defendant's guilty plea in criminal case to conspiring to defraud sugar refiners operated as collateral estoppel in civil lawsuit alleging fraud and civil theft).

Use of a criminal conviction to establish a fact or legal issue in a subsequent civil proceeding is justified because of the higher standard of proof and greater procedural protections provided a defendant in a criminal case. *Refined Sugars*, 709 F. Supp. at 1120. A criminal conviction therefore possesses substantial indicia of trustworthiness and is a sufficiently reliable determination of the relevant issues in a subsequent civil case. *Matter of Raiford v. Abney*, 695 F.2d 521, 523 (11th Cir. 1983); *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2nd Cir. 1986) ("the Government bears a higher burden of proof in the criminal than in the civil context and consequently may rely on the collateral estoppel effect of a criminal conviction

---

[1]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

in a subsequent civil case").

The elements for invoking the doctrine of collateral estoppel are: (1) the issue at stake must be identical to the one in the prior litigation; (2) the determination of the issue in the prior lawsuit must have been a critical and necessary part of the judgment in that action; and (3) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding. *Refined Sugars*, 709 F. Supp. at 1121, citing *Hart v. Yamaha*, 787 F.2d 1468, 1473 (11th Cir. 1986).

## B.  The Issues At Stake Are Identical

The Commission's complaint was filed in April 2008, alleging violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Exchange Act Section 10(b).  Facts at ¶¶1, 9.  In summary, the complaint alleged Langford violated these provisions by accepting $156,000 in cash and other financial benefits from Montgomery, Alabama broker William Blount and his firm, Blount Parrish & Co., in connection with Langford awarding Blount and Blount Parrish billions of dollars of bond and swap business on behalf of Jefferson County, Alabama.  *Id.* at ¶¶1-2, 10-54.

Subsequently, a Jefferson County grand jury indicted Langford on charges of bribery, money laundering, mail fraud, wire fraud, conspiracy to commit fraud,

and filing false tax returns.  Facts at ¶4.  The criminal charges were based on identical conduct – Langford accepting cash and other benefits from Blount and Blount Parrish in exchange for awarding Blount Parrish County bond and swap business.  *Id.* at ¶¶55-69.

Following an eight-day trial, a jury convicted Langford of all 60 counts with which the superseding indictment charged him.  Facts at ¶6.  The judge in the case subsequently adjudicated Langford guilty of all 60 counts and sentenced him to 15 years in prison, restitution, and a forfeiture order.  *Id.* at ¶7.

### *1.  The Facts Are Identical*

The Facts make it clear the Commission's complaint and the criminal charges are based on the same set of operative facts.   For example, the Commission's complaint alleges Langford accepted the following benefits from Blount and Blount Parrish: (1) assistance with securing an unsecured $50,000 loan from Colonial Bank in July 2002 (Facts at ¶¶13-14); (2) Albert LaPierre taking out a loan of his own from Colonial Bank with Blount's assistance to pay off the loan to Langford (Facts at ¶¶15-16); (3) Blount paying off LaPierre's loan in May and June 2003 with his own money (Facts at ¶¶17-18); (4) a $69,000 check and $6,000 in cash from Blount through LaPierre in June 2003 (Facts at ¶¶19-21); and (5) $30,000 in cash from Blount through LaPierre in August 2004 (Facts at ¶¶22-23).

The superseding indictment charges these same benefits violated various

criminal statutes.  For example, each one of the events described above is an act identified as comprising part of the conspiracy to commit fraud charged in Count Six of the superseding indictment.  Facts at ¶¶62 (a) ($50,000 loan in July 2002); (b) (LaPierre $50,000 loan in February 2003), (f and g) (Blount paying off the LaPierre loan in May and June 2003); (h) ($69,000 check in June 2003 from Blount to Langford through LaPierre); and (p and q) ($30,000 check from Blount to Langford through LaPierre in August 2004.

Furthermore, Count One of the superseding indictment charged Langford with bribery for accepting the $69,000 check from Blount and LaPierre in June 2003.  Facts at ¶55.  Count Seven of the superseding indictment charged Langford with bribery for accepting the $30,000 check from Blount and LaPierre in August 2004.  *Id.* at ¶64.

Even some of the uses to which Langford put the money he received from Blount are identically alleged in the complaint and the superseding indictment.  For example, both allege Langford used $12,000 of the $69,000 he received from Blount in June 2003 to pay bills at a high-end clothing store.  Facts at ¶¶21, 57.  Both also allege Langford used almost all of the $30,000 in August 2004 to pay back taxes.  *Id.* at ¶¶ 23, 62(r), 66.

In similar fashion, the complaint and the superseding indictment also alleged identical securities transactions in which Langford steered Jefferson County

business to Blount Parrish as a result of the cash and other financial benefits he received.  The complaint alleges Langford awarded Blount Parrish business in five County bond offerings and four swap transactions.  The five bond offerings were: (1) a $94 million capital improvement bond offering that closed on March 1, 2003 ("2003-A bonds"); (2) a $1.1 billion sewer bond offering that closed on May 1, 2003 ("2003-B bonds"); (3) a $1.05 billion sewer bond offering that closed on August 7, 2003 ("2003-C bonds"); (4) a $51 million general obligation bond offering that closed on August 1, 2004 ("2004-A bonds"); and (5) a $650 million limited obligation school bond offering that closed on December 20, 2004 ("2004 school bonds").  Facts at ¶11.

The four County swap agreements were: (1) a $1.1 billion swap agreement with JP Morgan Chase Bank ("JP Morgan") executed in connection with the 2003-B bonds ("2003-B swap"); (2) a $789 million swap agreement with JP Morgan executed in connection with the 2003-C bonds ("2003-C swap"); (3) a $111 million swap agreement with JP Morgan with an effective date of May 1, 2004 ("May 2004 swap"); and (4) a $1.5 billion swap agreement with Bear Stearns & Co. with an effective date of June 24, 2004 ("Bear Stearns swap").  Facts at ¶12.

The superseding indictment includes all nine of these transactions as part of Langford's illegal conduct: the 2003-A bonds (Facts at ¶62(c)); the 2003-B bonds and swap agreement (Facts at ¶62(d)); the 2003-C bonds and swap agreement

(Facts at ¶62(i)); the Bear Stearns swap agreement (Facts at ¶62(m)); the May 2004 swap agreement (Facts at ¶62(k)); the 2004-A bonds (Facts at ¶62(o)); and the 2004 school bonds (Facts at ¶62(t)).[2]

## *2.  The Legal Issues Are The Same*

The legal issues in both the criminal trial and this civil case are also largely identical.  In fact, many of the crimes of which Langford was convicted required a greater degree of culpability than need to prove the violations we have alleged.

The complaint alleges violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.  Section 17(a) of the Securities Act proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 proscribe fraudulent conduct in connection with the purchase or sale of securities.   These provisions prohibit essentially the same type of conduct.  *United States v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979); *SEC v. Unique Financial Concepts*, 119 F. Supp. 2d 1332, 1339 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir. 1999).  To prove violations of Securities Act Section 17(a)(1) and Exchange Act Section 10(b) and Rule 10b-5, the Commission must show a defendant (1) made a misrepresentation or omission (2) that was material (3) with scienter (4) in the offer or sale of or in

---

[2]  Although not necessary to a finding of Langford's liability, the complaint and the superseding indictment also identically allege the amount of money Blount and Blount Parrish received from the bond offerings and swap transactions.  Facts at ¶¶28, 35, 40, 43, 46, 48, 52, and 62(e), (j), (l), (n), (s), and (u).

connection with the purchase or sale of a security, and (5) use of interstate commerce, the mails, or a national securities exchange. *Basic, Inc. v. Levinson*, 485 U.S. 224, 235 n.13; *Unique Financial Concepts*, 119 F. Supp. 2d at 1339; *SEC v. Solow*, Case No. 06-81041-CIV, 2007 WL 1970806 at *2 (S.D. Fla. May 10, 2007).   Sections 17(a)(2) and (3) have the same elements, except they do not require a showing of scienter. *Aaron v. SEC,* 446 U.S. 680, 697 (1980).

The criminal charges of which Langford was convicted contain similar, and in many cases additional, elements of proof.

For example, the Commission has to plead and prove Langford made a misrepresentation or omission or engaged in a fraudulent scheme as the first element of a Section 17(a) or 10(b) violation.   In the criminal case, to find Langford guilty of Count Six of the superseding indictment, alleging conspiracy, the jury had to determine he engaged in a fraudulent scheme.   Jury Instructions, D.E. 172 in Case No. 08-cr-245, at 20-24 (attached as Exhibit 5 to the Facts).   As part of that count, the jury had to determine Langford made false statements or omitted to state facts.   *Id.* at 22.   Because the jury found Langford guilty of Count Six, it necessarily determined the first element of the fraud proof in this case as well – that Langford made misrepresentations or omissions.

The jury in the criminal case also had to determine any false statements or omissions Langford made concerned material facts – just as we must do here.   Jury

Instructions, Ex. 5, at 23.  The standards are virtually identical.  In the criminal case, a "'material fact' is a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction."  *Id.*  In this case, materiality is defined as "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action."  *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1323 (11th Cir. 1982).  Because the jury convicted Langford of Count Six, it therefore necessarily determined his conduct and statements concerned material facts.

The jury also had to address the third element of our proof – scienter.  To convict Langford of bribery (Counts 1, 7, 10, and 10-36 of the superseding indictment), the jury had to find he knowingly solicited or demanded the benefits charged in the indictment, that he intended to be influenced in connection with Jefferson County transactions, and that he acted corruptly.  Jury Instructions, Ex. 5, at 11-12.

That level of intent is even higher than the requirements under Section 17(a)(1) and Section 10(b) in this case.  For instance, the jury had to find that Langford acted "voluntarily, deliberately and dishonestly for the purpose of accomplishing . . . and unlawful end" to convict him of bribery.  Jury Instructions, Ex. 5, at 13.  To find Langford acted "knowingly," the jury had to determine he acted "voluntarily and intentionally," and "with the specific intent to do something

the law forbids." *Id.* at 14.

This level of knowledge is greater than the level of scienter the Commission must prove in this case.  Here, to demonstrate Langford's scienter, we need not necessarily establish knowing misconduct (although the Facts demonstrate Langford did act knowingly).  Rather, we can establish scienter by knowing misconduct *or* recklessness.  *Aaron*, 446 U.S. at 695; *Carriba Air,* 681 F.2d at 1322-24.  Again, because the jury convicted Langford of all of the bribery counts, it necessarily determined his level of intent more than surpassed the level the Commission must show to prove scienter.

Finally, the "in connection with" requirement is also sufficient in the criminal context to prove the "in connection with" requirement of Sections 17(a) and 10(b).  The jury had to find Langford solicited financial favors in connection with Jefferson County transactions in the criminal case.  Jury Instructions, Ex. 5, at 11-13.  The standard is broader in this case – we need to show only that Langford's conduct occurred in connection with securities transactions, not that Langford was influenced in regard to particular Jefferson County transactions.

The federal courts have long adopted a broad interpretation of the "in connection with" language of Section 10(b).  *SEC v. Zandford,* 535 U.S. 813, 819-20 (2002).  Courts have held that any statement or conduct reasonably calculated to reach or affect the average investor satisfies the "in connection with" requirement

of Section 10(b).  *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992).  This broad interpretation of the "in connection with" language is especially true in actions where the Commission is the plaintiff.  *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (in Commission actions, the meaning of this language "remains as broad and flexible as is necessary to accomplish the statute's purpose of protecting investors").  Therefore, conduct that is part of a fraudulent scheme whose result involves securities transactions meets the "in connection with" requirement. *Zandford*, 535 U.S. at 822-23.

Under this broad standard, the Facts show the undisclosed payments and benefits from Blount to Langford were in connection with the purchase and sale of securities and security-based swap agreements because they occurred during County bond transactions and related swap agreements and affected Blount Parrish's compensation as an underwriter and swap agreement consultant.  *SEC v. Washington County Utility District*, 676 F.2d 218, 226 n.17 (6th Cir. 1982) (failure of utility district manager to disclose payments from underwriter was in connection with securities transactions.  *See also In the Matter of Lazard Freres & Co.*, 1997 WL 742097 at *6, (65 SEC Docket 2256, Dec. 3, 1997) (payments by officer of broker-dealer to financial advisor that helped secure government underwriting business were in connection with the purchase or sale of securities because the payments were material to selection of broker-dealer as underwriter, which in turn

had a direct nexus with investors' purchase of securities); *In the Matter of First Fidelity Securities Group,* 1996 WL 20840 at *8 (61 SEC Docket 40, Jan. 9, 1996) (undisclosed payments by broker-dealer to governmental consultant to secure underwriting business met "in connection with" element because they concerned the selection of the underwriter who offered and sold government securities to the investing public).[3]

## C.  The Conduct And Legal Issues Were A Necessary Part Of The Criminal Conviction

The conduct alleged in the criminal indictment was a necessary and critical part of Langford's conviction in the criminal case.  For example, Count One of the superseding indictment charged Langford with bribery for accepting $69,000 from Blount and LaPierre on or about June 16, 2003.  Facts at ¶55.  The Commission's complaint also alleged this was one of the improper payments Langford accepted. *Id.* at ¶20.  Because this was the only conduct that led to the bribery charge in Count One, the conduct was a necessary and critical part of the jury's finding and the Court's adjudication of guilt.  Furthermore, as discussed above, the jury had to find Langford guilty of this misconduct beyond a reasonable doubt – higher than the preponderance of the evidence standard applicable to this civil case.

---

[3]  Langford and the other defendants in this case moved to dismiss a portion of the complaint on the grounds that the Court does not have jurisdiction over the four swap agreements in question. The Commission disputes that claim.  However, the Court need not reach that issue in order to enter summary judgment against Langford because there is no dispute the undisclosed benefits and payments also occurred in connection with County bond offerings, which are undeniably securities.  Facts at ¶¶10-11.

Count Seven of the superseding indictment charged Langford with bribery for accepting $30,000 from Blount and LaPierre on or about August 12, 2004. Facts at ¶64.   The Commission's complaint also alleged this was one of the improper payments Langford accepted.   *Id.* at ¶23.   Because this was the only conduct that led to the bribery charge in Count Seven, the conduct was a necessary and critical part of the jury's finding and the Court's adjudication of guilt.[4]

Furthermore, 32 of the individual acts comprising the conspiracy charge in Count Six of the superseding indictment are the same acts the Commission alleged violated Sections 10(b) and 17(a) in this case.   Superseding Indictment, Ex. 2, at 11-25, ¶¶8-21, 23-25, 30-32, 37, 41-43, 46-50, 54, 60, 65.   Although there were additional overt acts charged as part of the conspiracy, and the jury was not specifically asked which of the overt acts were part of its decision to convict Langford of Count Six, there are several factors indicating the 32 acts were a necessary and critical part of the jury's decision.

First, the overall thrust of the conspiracy charge was that Langford used his position as Jefferson County president to solicit funds from Blount in return for

---

[4]   Although the Commission does not have to show what Langford did with the improper payments from Blount and LaPierre, it is worth noting the jury convicted Langford of Count Nine of the superseding indictment, which charged Langford with money laundering for using the $30,000 to pay $29,241 in back taxes.  Facts at ¶¶66-67.  This is the same use of the money the Commission alleged.  Facts at ¶23.  In similar fashion, the jury convicted Langford of Count Four, which alleged money laundering because Langford used $12,000 of the $69,000 in June 2003 to pay luxury clothing bills.  This is also one of the uses of the money the Commission alleged.  Facts at ¶21.

awarding billions of dollars of County business to him and Blount Parrish. Superseding Indictment, Ex. 2, at 9-11.  Second, the 32 acts that are identical to the misconduct alleged in the Commission's complaint involve almost $150,000 of the $235,000 the superseding indictment alleges Langford accepted.  *Id.* at 10-11, ¶6 (Langford took $235,000); 11, ¶8 ($50,000 loan); 13, ¶20 ($69,000 check); and 19, ¶49 ($30,000 check).  Third, those same 32 acts involve nine of the eleven Jefferson County bond and swap transactions the indictment charges were part of the conspiracy.

Given that the money the Commission's complaint alleges Langford took and the transactions the complaint alleges Langford steered to Blount Parrish comprise an overwhelming majority of the overt acts of the conspiracy, it is safe for the Court to conclude those 32 acts were a necessary and critical part of the jury's decision to convict Langford of Count Six of the superseding indictment.

### D.  Langford Had A Full And Fair Opportunity To Litigate The Issues In The Criminal Case

The jury convicted Langford following an eight-day criminal trial, in which counsel represented Langford.  Facts at ¶6.  Thus, Langford had a full and fair opportunity to litigate the conduct and legal issues in the criminal case that are central to the allegations of the complaint against him in this case.  Accordingly, the Court should enter summary judgment in the Commission's favor and find that Langford violated Section 17(a) of the Securities Act, Section 10(b) of the

16

Exchange Act, and Exchange Act Rule 10b-5 (Counts I-III of the Commission's complaint).

## IV.  THE COURT SHOULD PERMANENTLY ENJOIN LANGFORD FROM COMMITTING FUTURE VIOLATIONS

The Commission seeks a permanent injunction against Langford to prevent future violations of the securities laws.  To obtain injunctive relief, the Commission must show a violation of the securities laws and a "reasonable likelihood" of future violations.  *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 1994).  The Commission has already demonstrated Langford's violations of the securities laws; thus the Court must analyze whether there is a reasonable likelihood of future violations.

In assessing whether there is a reasonable likelihood of future violations of the securities laws, courts look to the following factors: (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of a defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of the conduct and (6) likelihood of opportunities for future violations.  *Calvo*, 378 F.3d at 1216.

Whether a defendant is likely to repeat his or her violations depends on all the factors and the totality of the circumstances.  *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2nd Cir. 1975).   However, certain factors and

circumstances are especially important in the analysis.  For example, past illegal conduct is highly suggestive of the likelihood of future violations.  *Management Dynamics,* 515 F.2d at 807; *CFTC v. American Board of Trade,* 803 F.2d 1242, 1251 (2nd Cir. 1986); *CFTC v. Matrix Trading Group*, No. 00-8880-Civ, 2002 WL 31936799 at *12 (S.D. Fla. Oct. 3, 2002).  In addition, "factors suggesting that the infraction might not have been an isolated occurrence are always relevant." *Management Dynamics*, 515 F.2d at 807.  The cessation of illegal activity does not *ipso facto* justify the denial of an injunction.  *Id., citing United States v. Parke, Davis & Co.*, 362 U.S. 29, 47-48 (1960).

The factors and standards set forth above demonstrate the Commission is entitled to a permanent injunction enjoining Langford from violating Sections 17(a) and 10(b), and Exchange Act Rule 10b-5.  First, Langford's conduct was egregious.  He engaged in a fraudulent scheme over several years to enrich himself and his friends at the expense of Jefferson County, its sewer rate-paying customers, and those who purchased the County's bonds not knowing they had been subject to a corrupt award process.

Second, Langford's conduct was recurrent.  It involved repeatedly accepting money from Blount and LaPierre in 2003 and 2004, and awarding business in nine separate transactions worth billions of dollars during that time.  Third, Langford displayed the highest degree of scienter.  He ignored his inherent fiduciary duty to

act with good faith and undivided loyalty to the County and its residents. *United States v. DeVegter*, 198 F.3d 1324, 1328 (11th Cir. 1999). Instead, he defrauded the public by "secretly mak[ing] his decision based on his own personal interests" and benefiting from an undisclosed conflict of interest. *Id.* It is hard to imagine a higher degree of scienter, and it is worth emphasizing again the jury in the criminal case found Langford guilty of this misconduct beyond a reasonable doubt.

Fourth and fifth, Langford has steadfastly refused to admit his conduct was wrong, even in the light of Blount and LaPierre's decisions to plead guilty and acknowledge their wrongful conduct in the criminal case. Given this posture, Langford could not give any reasonable assurances he would not repeat his misconduct if given the opportunity. *American Board of Trade*, 803 F.2d at 1251:

> Even the cold record on appeal fairly shouts the probability that defendants would continue their operations if not enjoined. Their persistent contention that the Act did not apply to them and that the Commission's regulations therefore could not, as a statutory matter, apply to them, their contention that regulation by Congress and the Commission violates their constitutional rights, and their adherence to other even less meritorious positions furnish no confidence that if not enjoined, defendants would refrain from the options transactions found here to violate the Act and the regulations.

Sixth, although Langford is currently in prison and presumably will not have the opportunity to reoffend in the foreseeable future, the existence of the first five factors and the particularly egregious nature of his misconduct still justify an injunction. *Management Dynamics*, 515 F.2d at 807: "For implicit in the court's

observation that injunctive relief is not barred by a defendant's disclaimer of an intent to violate the law in the future, or even by the cessation of the illegal acts, is the principle that past violations may in certain circumstances justify an inference that a defendant is likely to violate the law in the future if not enjoined."

The Commission also seeks disgorgement and civil penalties from Langford. The Commission is not seeking imposition of those remedies at this time. Instead, we ask the Court to await the outcome of Langford's appeal of his criminal conviction, which may obviate the need for future litigation.

## V.  CONCLUSION

For all of the reasons discussed in this motion, the Commission asks the Court to enter summary judgment as a matter of law against Langford on Counts I-III of the complaint, and permanently enjoin Langford from future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.


July 16, 2010                          Respectfully submitted,

                                       s/Robert K. Levenson
                                       Robert K. Levenson
                                       Florida Bar No. 0089771
                                       Regional Trial Counsel
                                       U.S. Securities and Exchange Commission
                                       801 Brickell Avenue, Suite 1800
                                       Miami, Florida 33131
                                       (305) 982-6341 (direct dial)

(305) 536-4154 (facsimile)
levensonr@sec.gov
Appearing pursuant to Local Rule 83.1(c)

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas E. Baddley, Esq.
Baddley & Mauro, LLC
2545 Highland Avenue South
Suite 100
Birmingham, AL 35205
Telephone:  (205) 939-0090
Facsimile:  (205) 939-0064
*Counsel for Larry P. Langford*

Andrew P. Campbell, Esq.
Caroline S. Gidiere, Esq.
Campbell, Gidiere, Lee, Sinclair and Williams
2100-A SouthBridge Parkway, Suite 450
Birmingham, AL 35209
Telephone:  (205) 803-0051
Facsimile:  (205) 803-0053
*Counsel for William B. Blount and*
*Blount Parrish & Co., Inc.*

Joseph A. Fawal, Esq.
Fawal & Spina
1330 21st Way S., Suite 200
Birmingham, AL 35205
Telephone:  (205) 939-0590
Facsimile:  (205) 933-0101
*Counsel for Albert W. LaPierre*